## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

_____

|  |  |  |
|---|---|---|
| REBECCA RYAN, Derivatively and on Behalf of REGIONS MORGAN KEEGAN MULTI-SECTOR FUND | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Civil Action No. _____ |
| MORGAN ASSET MANAGEMENT, INC., ALLEN B. MORGAN JR., J. KENNETH ALDERMAN, JACK R. BLAIR, ALBERT C. JOHNSON, JAMES STILLMAN R. McFADDEN, W. RANDALL PITTMAN, MARY S. STONE, and ARCHIE W. WILLIS III | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | DEMAND FOR JURY TRIAL |
| REGIONS MORGAN KEEGAN MULTI-SECTOR FUND a Maryland corporation, | ) ) ) ) | |
| Nominal Defendant. | ) ) | |

_____

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

This is a derivative action brought on behalf of Regions Morgan Keegan Multi-Sector Fund ("RHY Fund" or "the Fund"). Through this action, Plaintiff Rebecca Ryan seeks to recover for RHY Fund and its shareholders the millions of dollars of damages caused by Defendants' breaches of fiduciary and professional duties, acts of bad faith, waste of corporate assets, unjust enrichment, gross mismanagement, statutory violations and other violations of law.

Plaintiff bases her claims on her own personal knowledge. For those matters to which she

does not have personal knowledge, Plaintiff bases her claims upon information and belief from the investigation conducted by and under the direction of her attorneys. This investigation included a review of press releases and other public statements made by RHY Fund and its officers and agents, filings by the Nominal Defendant with the United States Securities and Exchange Commission ("SEC"), and other publicly available articles and information about Nominal Defendant and its management in the financial and general press.

## JURISDICTION

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one intended to confer jurisdiction on a court of the United States that the Court would not otherwise have.

2.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including all or primarily all of Defendants' participation in the wrongful acts detailed herein, occurred in this District.  One or more of the Defendants either resides in or maintains executive offices in this District, and Defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here.

## PARTIES

**Plaintiff.**

3.     Plaintiff Rebecca Ryan is a citizen of the state of Arkansas. At all relevant time periods, Plaintiff is and was a shareholder of Nominal Defendant RHY Fund.

**Nominal Defendant.**

4.      Nominal Defendant RHY Fund was incorporated in the state of Maryland on November 14, 2005. The Fund's headquarters are located at Morgan Keegan Tower, Fifty North Front Street, Memphis, Tennessee 38103.  RHY Fund is a diversified closed-end management investment company, investing in a wide range of debt securities including corporate bonds, mortgage-backed and asset-backed securities, convertible debt securities, and distressed securities.

**Individual Defendants**

5.      Defendant Morgan Asset Management, Inc. (or "Fund Manager"), a registered investment advisor, managed and advised RHY Fund during the relevant time period. Morgan Asset Management, Inc. maintains its headquarters in Birmingham, Alabama, with a principal office located in Memphis, Tennessee. Morgan Asset Management, Inc. is a wholly-owned subsidiary of MK Holding, Inc., which is a wholly-owned subsidiary of Regions Financial Corporation.  Regions Financial Corporation is a regional holding company and the wholly-owning parent corporation of Regions Bank and Morgan Keegan, along with the above-mentioned MK Holding, Inc.

6.      Defendant Allen B. Morgan, Jr. ("Morgan") is a director of RHY Fund. Morgan has served as a Director of Regions Financial Corporation since 2001 and its Vice-Chairman since 2003. He has also served as a Director of Morgan Asset Management, Inc. since 1993. Morgan has been Chairman of Morgan Keegan & Company since 1969 and Executive Managing Director of Morgan Keegan & Company since 1969.

7.      Defendant J. Kenneth Alderman ("Alderman") is a director of RHY Fund. Alderman has been President of Regions Morgan Trust and Chief Executive Officer of Morgan

Asset Management, Inc. since 2002. Alderman is a certified Public Accountant and holds a Chartered Financial Analyst designation.

8.      Defendant Jack R. Blair ("Blair") is a director of RHY Fund. Blair also serves as non-executive Chairman of DJO, Inc. He also serves as a director of NuVasive, Inc., Buckman Laboratories, Inc. and Active Implants Corporation. Blair served as non-executive Chairman of SCB Computer Technology, Inc. from September 2000 until March 2004, when CIBER, Inc. acquired the company.

9.      Defendant Albert C. Johnson ("Johnson") is a director of RHY Fund. Johnson has been an independent financial consultant since 1998. He also served as Director of Books-A-Million, Inc. since 2005. He was Senior Vice President and Chief Financial Officer of Dunn Investment Company from 1994 to 1998. He was also with Arthur Andersen LLP from 1965 to 1994, retiring as the Managing Partner of the firm's Birmingham Office.

10.      Defendant James Stillman R. McFadden ("McFadden") is a director of RHY Fund. McFadden has been Chief Manager of McFadden Communications, LLC since 2002. He has served as a Director for several private companies since 1997.

11.      Defendant W. Randall Pittman ("Pittman") is a director of RHY Fund. Pittman has been Chief Financial Officer of Emageon Inc. since 2002. From 1999 to 2002, he was Chief Financial Officer of BioCryst Pharmaceuticals, Inc. From 1998 to 1999, he was Chief Financial Officer of ScandiPharm, Inc. From 1995 to 1998, he served as Senior Vice President- Finance of CaremarkRx. From 1983 to 1995, he held various positions with AmSouth Bancorporation, including Executive Vice President and Controller.

12.      Defendant Mary S. Stone ("Stone") is a director of RHY Fund. Stone has been a

professor at the University of Alabama's Culverhouse School of Accountancy since 1981. She has served as the Director of the Culverhouse School of Accountancy since 2002.

13.     Defendant Archie W. Willis, III (Willis") is a director of RHY Fund. Willis has been President of Community Capital since 1999 and First Vice President of Morgan Keegan & Company, Inc. from 1991 to 1999. He also served as a Director of Memphis Telecom, LLC since 2001 and a Member of the Advisory Board of Tri-State Bank of Memphis since 2006.

14.     The Defendants identified in ¶ 5 through ¶ 13 are collectively referred to herein as the Individual Defendants.

## DUTIES OF INDIVIDUAL DEFENDANTS

15.     The Individual Defendants, through their positions as directors of the RHY Fund and their receipt of reports, attendance at meetings and access to all of the Fund's books, records and other proprietary information, had responsibility for and therefore were in possession of material, non-public information concerning the Fund and its operations, finances and business prospects.

16.     By reason of their positions as directors and/or fiduciaries of RHY Fund and because of their ability to control the business and corporate affairs of RHY Fund, the Individual Defendants owed RHY Fund and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, were and are required to use their utmost ability to control and manage RHY Fund in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of RHY Fund and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

17.     Each director and officer of RHY Fund owes to RHY Fund the fiduciary duty to

exercise due care and diligence in the administration of the affairs of RHY Fund and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

18.     In addition, as directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Fund's operations so that the market price of the Fund's common stock would be based on truthful and accurate information.

19.     The Individual Defendants, because of their positions of control and authority as directors of RHY Fund, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Fund. Because of their advisory, executive, managerial and directorial positions with RHY Fund, each of the Individual Defendants had access to adverse non-public information about the operations of RHY Fund, including, without limitation, the misconduct in which the Individual Defendants caused RHY Fund to engage.

20.     At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of RHY Fund, and was at all times acting within the course and scope of said agency.

21.     To discharge their duties, the manager and directors of RHY Fund were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of RHY Fund. By virtue of such duties, the manager and directors of RHY Fund were required, among other things, to:

a.      select and retain the Fund's Investment Advisor;

b.      manage, conduct, supervise and direct the business affairs of RHY Fund in accordance with federal and state law and federal rules and regulations and the charter and bylaws of RHY Fund;

c.      neither violate nor knowingly permit any officer, director, or employee of RHY Fund to violate applicable federal laws, rules and regulations and/or state law;

d.      establish and maintain systematic and accurate reports and records of the business and affairs of RHY Fund and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of said reports and records;

e.      maintain and implement an adequate and functioning system of internal financial and accounting controls, such that RHY Fund's financial statements and information would be accurate;

f.      exercise reasonable control and supervision over the public statements to the securities markets and trading in RHY Fund stock by the officers and employees of RHY Fund;

g.      remain informed as to the status of RHY Fund's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with state and federal securities laws;

h.      supervise the preparation and filing of any audits, reports or other information required by law from RHY Fund and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of RHY Fund and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

i.      prudently protect the Fund's assets, including taking all necessary steps to recover assets (cash, stock options) improperly paid to Fund executives and directors together with the related costs (professional fees) proximately caused by the conduct described herein.

22.    During all relevant times hereto, each of the Individual Defendants occupied positions with RHY Fund or were associated with the Fund in such a manner as to make them privy to confidential and proprietary information concerning the Fund.  Because of these positions and such access, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were concealed from the public. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were and are obligated to disclose material, adverse information regarding RHY Fund and to abstain from trading on such information so as to profit from its misuse.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

23.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and acted in concert with and conspired with one another, in furtherance of their common plan or design. In addition to the

wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

24.     During all relevant times hereto, the Individual Defendants initiated a course of conduct that was designed to and did:

(i) cause RHY Fund to misrepresent the true nature of its investment portfolio and its exposure to subprime securities;

(ii) maintain the Individual Defendants' executive and directorial positions at RHY Fund, and the profits, power and prestige which the Individual Defendants enjoyed as a result of those positions, in spite of these Defendants' violations of law and other fiduciary breaches (as set forth herein);

(iii) deceive the investing public, including Plaintiff and the other shareholders of RHY Fund, regarding Defendants' management of RHY Fund's financial conditions; and

(iv) artificially inflate the market price of RHY Fund securities during all relevant times

In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants, and each of them, took the actions as herein set forth.

25.     Each of the Individual Defendants, by acting as herein described, did so knowingly or in such an intentional manner as to constitute a breach of fiduciary duty owed to the Company and its shareholders.

## BACKGROUND

26.     RHY Fund made its initial offering to the public on January 23, 2006.  RHY Fund is a closed-end fund with a limited amount of available shares. The price of shares of close-ended

9

funds, like RHY Fund, are determined partially by the value of the investments in the fund and partially by the premium placed on the shares by the market. RHY Fund initially offered its shares at $15.00 per share.

27.     According to its prospectus, RHY Fund was to invest in a wide range of debt securities, including corporate bonds, mortgage-backed and asset-backed securities, convertible debt securities and distressed securities, including securities of companies in bankruptcy reorganization proceedings or otherwise in the process of debt restructuring.

28.     Part of RHY Fund's portfolio was invested in collateralized debt obligations ("CDOs"). CDOs are an asset-backed and structured credit product constructed from a portfolio of fixed-income assets. These assets are divided into different tranches: senior tranches (AAA), mezzanine tranches (AA to BB) and equity tranches (unrated). Losses are applied in reverse order of seniority. Therefore, junior tranches offer higher interest rates to investors to compensate for the added risk of default. Many of the CDOs in RHY Fund's portfolio were backed by mortgages to high risk borrowers with shaky credit histories.

29.     Unlike typical securities, CDOs do not trade on open-market exchanges. This increases the difficulty in valuing the CDOs on any given day.

30.     In the summer of 2007, the well-publicized subprime credit crisis began to materialize. Despite the fund's substantial exposure to the crisis, RHY Fund concealed this fact from the market. Because of that concealment, the shares of RHY Fund continued to trade at artificially inflated prices.

31.     It was not until July 2007 that RHY Fund began to publically acknowledge its exposure to the subprime market. Finally, the Fund admitted to its investors that it was

encountering difficulty in determining the fair value of its assets because of the illiquidity associated with the assets. Because of this difficulty, the Fund said that it required a consultant to determine the fair value of its assets.

32.     On November 7, 2007, James Kelsoe ("Kelsoe"), portfolio manager to the Fund, wrote a letter to the Fund's investors. In the letter, Kelsoe disclosed the Fund's exposure to the subprime credit crisis and the resulting decline in the Fund's net asset value. Kelsoe further revealed that the Fund held 11.4% of its portfolio in subprime mortgage-related investments.

33.     On November 8, 2007, a day after Kelsoe's letter, the Fund closed at $5.41 a share, off approximately 63% from the Fund's share prices on July 13, 2007.

34.     These events revealed the omissions and misstatements contained in the Fund's Registration Statements and Prospectuses. Particularly, RHY Fund omitted that:

(i)     the Fund lacked adequate controls and hedges to minimize the risk of loss from mortgage delinquencies; and

(ii)    the Fund carried a extensive liquidity risk because of the large positions it held in illiquid securities.

35.     Furthermore, in its Registration Statements and Prospectuses, RHY Fund misstated:

(i)     the proper value of the underlying assets held by the Fund;

(ii)    the extent of the Fund's risk exposure to mortgage-backed assets; and

(iii)   the extent that the Fund was subject to fair value procedures.

36.     These financial statements violated both Generally Accepted Accounting Principles ("GAAP") as required by Regulations S-X as well as SEC rules.

## VIOLATIONS OF GAAP

37. During the Class Period, Defendants represented repeatedly that the Company's financial statements were prepared in conformity with GAAP. These representations were materially false and misleading when made because Defendants, in violation of GAAP, knowingly or recklessly employed improper accounting practices, which falsely inflated the Fund's assets reported on the balance sheet.

38. GAAP, as set forth in AU 411.02, are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

39. Indeed, compliance with GAAP is a fundamental obligation for reporting companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

40. Management is responsible for preparing financial statements that conform with

GAAP.   As noted by the American Institute of Certified Public Accountants ("AICPA")

Professional Standards in U.S. Auditing Standards ("AU") Section 110.03:

> The financial statements are management's responsibility.   The auditor's responsibility is to express an opinion on the financial statements. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements.   The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management.   The auditor's knowledge of these matters and internal control is limited to that acquired through the audit.   Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.   The independent auditor may make suggestions about the form or content of the financial statements of draft, in whole or in part, based on information from management during the performance of the audit.   However, the auditor's responsibility for the financial statements he or she has audited is confined to the expression of his or her opinion on them.

41.   RHY Fund's materially false and misleading financial statements resulted from a series of deliberate decisions by the Fund Manager designed to conceal the truth regarding the proper value of the CDO's held in the portfolio, which misstated RHY's actual net asset value.

42.   As a result of accounting improprieties, defendants caused RHY Fund's reported financial results to violate, among other things, the following provisions of GAAP for which each defendant is necessarily responsible:

a.   The principle that financial reporting should provide information that is useful to present and potential investors in making rational investment decisions and that information should be comprehensible to those who have a reasonable understanding of business and economic activities (FASB Statement of Concepts No. 1, ¶ 34);

b.   The principle of materiality, which provides that the omission or

misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASB Concepts Statement No. 2, ¶ 132) (SEC Staff Accounting Bulletin No. 99);

        c.     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Concepts Statement No. 1, ¶ 50);

        d.     The principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Concepts Statement No. 1, ¶ 42);

        e.     The principle that financial reporting should be reliable in that it represents what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting (FASB Concepts Statement No. 2, ¶¶ 58-59);

        f.     The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and

conditions (FASB Concepts Statement No. 2, ¶ 80);

       g.    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Concepts Statement No. 2, ¶¶ 95, 97);

       h.    The principle that contingencies that might result in gains are not reflected in accounts since to do so might be to recognize revenue prior to its realization and that care should be used to avoid misleading investors regarding the likelihood of realization of gain contingencies (FASB No.5, *Accounting for Contingencies*); and

       i.    The principle that financial statements disclose contingencies when it is at least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred (SFAS No. 5, ¶ 10) and that financial statements disclose significant risks and uncertainties associated with an entity's operations (AICPA's Statement of Position No. 94-6).

43.    As discussed, defendants were obligated by law to select generally accepted accounting principles that were appropriate to reflect the business activities of the entity.  The Individual Defendants also had the responsibility to design, implement, and maintain a system of internal accounting controls that would provide accounting records that reflect the transactions that were consummated by the entity, as further required by the SEC.

44.    More particularly, Section 13 of the 1934 Securities and Exchange Act requires that:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall:

A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

    i.    transactions are executed in accordance with management's general or specific authorization;

    ii.    transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

    iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

    iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

45.    Moreover, following the catastrophic accounting scandals in recent years, Congress enacted enhanced financial statement responsibilities for senior management with respect to not only those financial accounting systems and internal control systems utilized by public companies, as follows:

Sec. 302. CORPORATE RESPONSIBILITY FOR FINANCIAL REPORTS.

(A)    Regulations Required.--The Commission shall, by rule, require, for each company filing periodic reports under section 13(a) or 15(d) of the Securities Exchange Act of 1934(15 U.S.C. 78m, 78o(d)), that the principal executive officer or officers and the principal financial officer or officers, or persons performing similar functions, certify in each annual or quarterly report filed or submitted under either such section of such Act that--

(1)    the signing officer has reviewed the report;

(2)    based on the officer's knowledge, the report does not contain any untrue

statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading;

(3)    based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report;

(4)    the signing officers--

(A)    are responsible for establishing and maintaining internal controls;

(B)    have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities, particularly during the period in which the periodic reports are being prepared;

(C)    have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report; and

(D)    have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date;

(5)    the signing officers have disclosed to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function)--

(A)    all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data and have identified for the issuer's auditors any material weaknesses in internal controls; and

(B)    any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal controls; and

(6)    the signing officers have indicated in the report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of their evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(c)    Deadline.--The rules required by subsection (a) shall be effective not later than 30 days after the date of enactment of this Act.

46.     In light of these recent changes requiring certification of financial statements, as set forth herein,  publicly-held companies and their senior executives are no longer permitted to avoid criminal or civil liability by arguing that they were unaware of material misstatements contained in such publicly filed financial information.[1]

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

47.     Plaintiff brings this action derivatively in the right and for the benefit of RHY Fund to redress injuries suffered, and to be suffered, by the Fund as a direct result of the breaches of

---

[1]Sec. 906 of the Sarbanes-Oxley Act provides:

CORPORATE RESPONSIBILITY FOR FINANCIAL REPORTS.

(a) In General.--Chapter 63 of Title 18, United States Code, is amended by inserting after section 1349, as created by this Act, the following:

Sec. 1350. Failure of corporate officers to certify financial reports

(a) Certification of Periodic Financial Reports.--Each periodic report containing financial statements filed by an issuer with the Securities Exchange Commission pursuant to section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d)) shall be accompanied by a written statement by the chief executive officer and chief financial officer (or equivalent thereof) of the issuer.

(b) Content.--The statement required under subsection (a) shall certify that the periodic report containing the financial statements fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)) and that information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of the issuer.

(c) Criminal Penalties.--Whoever--

(1) certifies any statement as set forth in subsections (a) and (b) of this section knowing that the periodic report accompanying the statement does not comport with all the requirements set forth in this section shall be fined not more than $1,000,000 or imprisoned not more than 10 years, or both; or
(2) willfully certifies any statement as set forth in subsections (a) and (b) of this section knowing that the periodic report accompanying the statement does not comport with all the requirements set forth in this section shall be fined not more than $5,000,000, or imprisoned not more than 20 years, or both.

fiduciary duty, violations of law, abuse of control, gross mismanagement and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants.  This is not a collusive action to confer jurisdiction of this Court which it would not otherwise have.

48.     Plaintiff will adequately and fairly represent the interests of RHY Fund and its shareholders in enforcing and prosecuting its rights.

49.     Plaintiff is and was an owner of the stock of RHY Fund during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

50.     The present Board of Directors consists of eight members.  Plaintiff has not made any demand on the present Board of Directors of RHY Fund to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the reasons outlined in ¶¶ 50-62 below:

51.     Each of the directors of RHY Fund authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein.  Because each director is interested and not independent, he or she could not fairly and fully prosecute a suit even if such suit was instituted by them.

52.     The RHY Board of Directors and Fund Manager participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise the wrongs from RHY Fund's stockholders or recklessly, knowingly and/or negligently disregarded the wrongs complained of herein and therefore are not disinterested parties.  As a result of their access to and review of internal corporate documents, communications with corporate officers and

19

attendance at management and Board meetings, each director of RHY Fund had actual or constructive knowledge regarding the improper financial reporting.

53.     As a director of RHY Fund, each Board member had and has specific duties they owed to the Company and its shareholders.  In breach of these specific duties, each Board member, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to occur and participated in efforts to conceal or disguise those wrongs from RHY Fund's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein. Therefore, members of the Board cannot exercise independent objective judgment in deciding whether to institute or vigorously prosecute this action because each Board member is interested personally in the outcome of such an action, as it is his actions that have played a part in subjecting the Company to millions of dollars in liability for potential violations of applicable securities laws.

54.     In spite of the of the Fund's huge losses and mismanagement by the Fund Manager, Morgan Asset Management, on October 31, 2007, the Director Defendants unanimously agreed to extend the agreement between the Fund and the Fund Manager. This extension demonstrates the Director Defendants' acquiescence of the Fund Manager's improper conduct and the ultimate futility in seeking a demand upon the Board.

55.     Furthermore, the Fund Manager and RHY Fund share the same corporate parent. Therefore, in order to bring this suit, all of the directors of RHY Fund would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

56.     The acts complained of constitute violations of the fiduciary duties owed by RHY

Fund's officers and directors and these acts are incapable of ratification.

57.     Any suit by the directors of RHY Fund to remedy these wrongs would likely expose the Individual Defendants and RHY Fund to further violations of the securities laws, which would result in civil actions being filed against one or more of the Individual Defendants and thus they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

58.     RHY Fund has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for RHY Fund any part of the damages the Fund suffered and will suffer thereby.

59.     If the Individual Defendants were to bring this derivative action against themselves, they would necessarily challenge their own misconduct, which underlies allegations against them contained in class action complaints for violations of federal securities laws, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.

60.     Each member of the RHY Fund Board is, directly or indirectly, the recipient of remuneration paid by the Fund, including benefits, stock options and other emoluments by virtue of his or her Board membership and control over the Fund, the continuation of which is dependent upon his or her cooperation with the other members of the Board, and his or her participation and acquiescence in the wrongdoing set forth herein, and each member is therefore incapable of exercising independent objective judgment in deciding whether to bring this action.  Because of

their association as directors of the Fund and their positions as present or former employees of the Fund's parent and sister companies, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment.

61.   If RHY Fund's current and past officers and directors are protected by directors' and officers' liability insurance against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this Complaint, they caused the Fund to purchase that insurance for their protection with corporate funds, *i.e.,* monies belonging to the stockholders of RHY Fund.  Due, however, to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions that eliminate coverage for any action brought directly by RHY against these Defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these Director Defendants were to sue themselves or certain of the officers of RHY Fund, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  In the absence of liability insurance coverage, as would occur if a similar suit were filed by the Company itself, the Director Defendants would not cause RHY to sue themselves, since they will face a large uninsured liability.

62.   Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the Individual Defendants have failed and refused to seek to recover for RHY Fund for any of the wrongdoing alleged by Plaintiff herein.

63.   Plaintiff has not made any demand on shareholders of RHY to institute this action

since such demand would be a futile and useless act for the following reasons:

a.   RHY is a publicly traded company with thousands of holders of record;

b.   Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

c.   Making demand on all shareholders would force Plaintiff to incur huge expenses assuming all shareholders could be individually identified.

## FIRST CAUSE OF ACTION

### Against the Individual Defendants for Breach of Fiduciary Duty

64.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

65.    As alleged herein the Individual Defendants owed and owe RHY Fund fiduciary duties.  By reason of their fiduciary relationships, the Individual Defendants owed and owe RHY Fund the highest obligations of fidelity, trust, loyalty and due care.  Additionally, each Individual Defendant owed and owes RHY Fund a duty to ensure that the Fund operates in a diligent, fair, honest and equitable manner and complied with all applicable federal and state laws, rules and regulations.

66.    Each of the Individual Defendants knew, should have known, or recklessly disregarded that the Individual Defendants violated and breached their fiduciary duties of care, good faith, loyalty, reasonable inquiry, oversight and supervision.

67.    Each of the Individual Defendants had actual or constructive knowledge that he or she had caused the Company to improperly report the financial condition and business prospects

of RHY Fund, and failed to correct the Fund's publicly reported financial statements.  These actions could not have been in a good faith exercise of prudent business judgment to protect and promote the Fund's corporate interests.

68.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary duties the Fund has suffered significant damages.

69.     As a direct and proximate result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND CAUSE OF ACTION

### Violations of Section 11 of the
### Securities and Exchange Act against All Defendants

70.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71.     the Registration Statement for the offering of the Fund were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state required material facts.

72.     The Individual Defendants are responsible for the contents and dissemination of the Registration Statements.

73.     As issuer of the shares, RHY Fund is strictly liable to plaintiff for the misstatements and omissions.

74.     The Individual Defendants did not make a reasonable investigation or possess reasonable grounds to believe the statements contained in the Registration Statements were true and without omissions of any material facts and were not misleading.

75.     By the conduct described, each Individual Defendant violated or controlled a person who violated § 11 of the 1933 Act.

76.     Plaintiff acquired the Fund's shares pursuant to the Registration Statements. Plaintiff has sustained damages from the decline in the price of the Fund's shares after the Defendants' violations.

77.     At the time Plaintiff bought the Fund's shares, she did not know the facts about the Individual Defendants' wrongful conduct and could not have discovered these facts before July 13, 2007.

### THIRD CAUSE OF ACTION

### Against All Individual Defendants for Gross Mismanagement

78.     Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

79.     By their actions and/or inaction alleged herein, the Individual Defendants, directly, indirectly, knowingly, willfully and/or intentionally through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary obligations with regard to the prudent management of RHY Fund in a manner consistent with the operations of a public company.

80.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, RHY Fund has sustained significant damages.

81.     As a direct and proximate result of the misconduct and breaches of fiduciary duty alleged herein, the Individual Defendants are liable to the Company.

### FOURTH CAUSE OF ACTION

**Against All Individual Defendants for Abuse of Control**

82.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

83.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence RHY Fund, for which they are legally responsible.

84.    As a result of the Individual Defendants' abuse of control, RHY Fund has sustained significant damages.

85.    As a direct and proximate result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## FIFTH CAUSE OF ACTION

**Against All Individual Defendants for Unjust Enrichment and
Waste of Corporate Assets**

86.    Plaintiff incorporates by reference and alleges each and every allegation contained above, as though fully set forth herein.

87.    As a result of the Individual Defendants' foregoing conduct, the Individual Defendants have caused RHY Fund to waste valuable assets and have subjected the Company to potential material liability for securities fraud, possibly reaching hundreds of millions of dollars in damages, as well as significant legal defense fees.

88.    As a result of the Individual Defendants' conduct described herein, all of the Individual Defendants have been unjustly enriched and/or aided and abetted in the unjust enrichment of the other Individual Defendants at the expense of RHY Fund and its shareholders.

89.    The Individual Defendants should be required to disgorge the gains which they will

obtain or have unjustly obtained at the expense of RHY Fund and its shareholders.  A constructive trust for the benefit of RHY Fund and its shareholders should be imposed upon those proceeds.

90.     As a direct and proximate result of the Individual Defendants' unjust enrichment and waste of corporate assets RHY Fund has sustained significant damages.

91.     As a direct and proximate result of the misconduct alleged herein, the Individual Defendants are liable to the Fund.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Declaring that the Individual Defendants, and each of them, have committed breaches of their fiduciary duties to RHY Fund;

B.     Requiring the Individual Defendants to pay RHY Fund the amounts by which the Company has been damaged by reason of the conduct complained herein;

C.     Requiring restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

E.     Granting extraordinary equitable and/or injunctive relief as permitted by law or equity for the Defendants' breaches of fiduciary duties; and

F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 13, 2008

Respectfully Submitted,

By:  /s/ Kevin H. Sharp
Kevin H. Sharp, BPR # 016287
DRESCHER AND SHARP, P.C.
1720 West End Avenue, Suite 300
Nashville, Tennessee 37212
(615) 425-7111

CAULEY BOWMAN CARNEY & WILLIAMS, PLLC
J. Allen Carney
Randall K. Pulliam
Bart Dalton
11311 Arcade Dr., Suite 200
Little Rock, AR 72211
Phone:  (501) 312-8500
Attorneys for Plaintiff